IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PHILLIP LEE FANTONE,                                    )
                                                        )
        Plaintiff,                                      )
                                                        )
        v.                                              )        Civil Action No. 11-0484
                                                        )        District Judge Gary L. Lancaster, Chief
MICHAEL J. HERBIK, DD,                                  )        Magistrate Judge Cynthia Reed Eddy
    in his official and individual capacity,            )
BRIAN V. COLEMAN,                                       )
    in his official and individual capacity,            )
ROBERT TRETINIK, RN,                                    )
    in his official and individual capacity,            )
PETE SAAVEDRA,                                          )
    in his official and individual capacity,            )
DARLA COWDEN, PA,                                       )
    in her official and individual capacity.            )
                                                        )
        Defendants.                                     )

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

**I**.    **RECOMMENDATION**

For the reasons that follow, it is respectfully recommended that Plaintiff's Motion for Summary Judgment (ECF No. 84) be denied and that the Motions for Summary Judgment filed by Defendants (ECF. Nos. 86, 90 and 102) all be granted.

**II.**   **REPORT**

Plaintiff, Phillip Lee Fantone, an inmate currently confined in the State Correctional Institution in Coal Township, initiated this *pro se* prisoner's civil rights action pursuant to 42 U.S.C. §§ 1983 in which he claims that Defendants violated his rights as protected by the Eighth and Fourteenth Amendments of the United States Constitution with regards to his chronic back ailments, which ultimately led to major back surgery. Presently pending before the Court are Motions for Summary Judgment filed by all parties to this action.

1

## A. <u>Standard of Review</u>

Federal Rule of Civil Procedure 56(a)[1] provides that summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  When applying this standard, the court must examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp</u>., 475 U.S. 574, 587 (1986).

The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial.  Fed. R. Civ. P. 56(e); <u>Williams v. Borough of West Chester</u>, 891 F.2d 458, 460–461 (3d Cir. 1989) (the non-movant must present affirmative evidence -- more than a scintilla but less than a preponderance -- which supports each element of his claim to defeat a properly presented motion for summary judgment).  The non-moving party cannot rest "solely on assertions made in the pleadings, legal memoranda, or oral argument," <u>Berckeley Inv. Group. Ltd. v. Colkitt</u>, 455 F.3d 195, 201 (3d Cir. 2006), but must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (*i.e.*, depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. <u>Celotex</u>, 477 U.S. at 322.  *See also* <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir. 2001).   The non-moving party "must present more than just bare assertions, conclusory

---

[1]   Pursuant to the 2010 amendments to the Federal Rules of Civil Procedure, the oft-cited summary judgment standard is now located in Rule 56(a) rather than 56(c), with a slight change of wording.  Although the word "issue" has been replaced with "dispute," this change does not affect the substantive standard or the applicability of prior decisions construing the standard.  *See* Fed. R. Civ. P. 56(a) advisory committee's note.

allegations or suspicions to show the existence of a genuine issue." Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005).

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The inquiry, then, involves determining "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting Anderson, 477 U.S. at 251-52). "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the non-moving party." Pignataro v. Port Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). Moreover, *pro se* pleadings are to be construed liberally. Haines v. Kerner, 404 U.S. 519, 520 (1972).

### B. Relevant Material Facts

During the relevant time period, Defendants held the following positions at SCI-Fayette: Dr. Michael J. Herbik, Medical Director; Robert L. Tretinik, Correctional Health Care Administrator (CHCA); Darla K. Cowden, Physician Assistant; Brian Coleman, Superintendent; and Dr. Peter Saavedra, Staff Psychiatrist. Plaintiff's medical records reveal the following.

Plaintiff, like many people his age, has a history of chronic low back pain. X-rays from 2005 and 2007 showed generalized spinal osteoarthritis, degenerative disc disease and lumbar levoscoliosis (ECF No. 93-13, p. 1). On May 23, 2007, Dr. Herbik restarted Plaintiff on Neurontin for his back pain (ECF No. 93-2, p. 8). Subsequently, Plaintiff was approved for

physical therapy, a back support and various other medications, including Motrin, Prednisone, Zantac, Ultram and Tylenol. His medical records show that he was seen by a physician or physician assistant, on average, once a week for pain management throughout 2007 (ECF No. 93-3).

On December 7, 2007, Plaintiff was seen on a sick call visit complaining of extreme pain. The records further provide that Plaintiff's MRI report could not be located but that x-rays showed degeneration of his spine. Notes indicate no need for referral until the record could be reviewed to determine whether a MRI had been performed. On December 14, 2007, Plaintiff was placed on Vicodin and referred to pain management.

On February 14, 2008, Plaintiff was sent to the infirmary for his back pain. The next day, he was transferred to medical housing and given steroids for the pain. On February 21, 2008, Plaintiff was seen by Dr. Herbick who noted that Plaintiff reported his back was better after resting but he still had pain. Dr. Herbick further noted that Plaintiff stated he was not interested in surgery because he was getting out of prison in the summer (ECF No. 93-2, p. 26). Plaintiff's Progress Notes indicate that conservative care should be continued due to a neurological consult from 2004 that indicated surgery would not help Plaintiff's condition. At that time, no new MRI was ordered as surgery was not an option (ECF No. 93-2, p. 270).

On February 25, 2008, P.A. Cowden examined Plaintiff during a sick call visit and ordered an x-ray and adjusted his medications. The x-ray showed post cervical fusion of C5-6-7, mild generalized arthritic changes and modest C4-5 degenerative disc disease. On March 6, 2008, Dr. Herbik re-ordered Methadone for pain (ECF No. 93-3, p. 30). On April 15, 2008, Plaintiff was placed in the infirmary for observation (ECF No. 93-3, p. 30). On April 16, 2008, after meeting with Plaintiff, Dr. Herbik ordered bed rest as well as medical housing and altered

Plaintiff's Methadone pain medication. The next day, Dr. Herbik ordered Plaintiff the use of a walker while in the infirmary. On April 18, 2008, P.A. Cowden saw Plaintiff on sick call and noted that he asked for steroid medication, which was ordered (ECF No. 93-3, p. 31). Progress Notes on April 21, 2008, indicate that Plaintiff was walking approximately 100 yards without his walker and without difficulty and appeared to be comfortable (ECF No. 93-3, p. 33). Three days later on April 24, 2008, Plaintiff reported that he was doing better and the pain and numbness were going away. Plaintiff was continued on pain medications.

On May 29, 2008, Plaintiff submitted a sick call for neck pain and right shoulder pain. On June 13, 2008, Plaintiff submitted a sick call about a lump on his left thigh. Plaintiff elected not to seek removal of the lump as it could delay his parole.

On July 16, 2008, Plaintiff reported to Defendant Cowden that nothing was working for his pain. At that time, he was referred to the physician line for pain management and pain medications were ordered. It is noted that he was scheduled to be transferred to a halfway house and on August 29, 2008 he was cleared for parole (ECF No. 93-2, p. 36).

Sometime before November 6, 2008, Plaintiff was returned to state custody to the State Correctional Institution at Pittsburgh (SCIP) (ECF No. 103-1, p. 63). An x-ray of Plaintiff's spine was done on December 8, 2008, which revealed scoliosis with mild degenerative joint disease.

The next progress report is dated January 4, 2009 and indicates Plaintiff complained about back pain. On January 5, 2009 he was seen on sick call stating that the pain had increased to the point where he was having trouble walking (ECF No. 93-2, p. 39); thereafter, several pain medications were prescribed (ECF No. 9-3-, p. 38).

On February 3, 2009, Plaintiff complained of progressive back pain, numbness of legs

and weakness to extremities (ECF No. 93-2, p. 41). Pain medications were ordered and the x-ray dated December 8, 2008 was reviewed. On February 11, 2009 Plaintiff complained that he was sleeping only three hours a night due to the pain and that he was missing meals due to the long walk to the mess hall. At that point, Plaintiff requested to be housed in the infirmary (ECF No. 93-2, p. 42). His progress notes indicate that he ambulates around the room without difficulty and without the use of his cane. A physical therapy consult was ordered.

On February 17, 2009, Plaintiff was seen by Dr. Rueda of the psychiatric department. Dr. Rueda noted that he was requesting assistance because of his history of post-traumatic stress disorder and insomnia, irritability. He was then still taking Methadone for his low back pain. He complained of insomnia and trauma-related nightmares. Dr. Rueda noted his mood was irritable, his affect was congruent, and his thought processes were organized; there was no evidence of psychosis or hallucinations. Dr. Rueda's diagnosis was mood disorder secondary to PTSD and opiate dependence, with an axis II diagnosis of anti-social personality disorder. He discussed the benefits and risks of Depakote with Plaintiff and prescribed it for him (ECF No. 103-2, p. 21).

On February 27, 2009, Plaintiff was transferred from SCIP to SCI-Fayette (ECF No. 93-2, p. 43). On March 3, 2009, he was seen by P.A. Cowden for a medical review. His records indicate that he was a PV (parole violator) and that he was not medically cleared for sports or work.

On March 6, 2009, Dr. Saavedra noted that the nursing staff reported that Plaintiff was refusing his Depakote and had signed an "against medical advice" form refusing the medicine (ECF No. 103-2, p. 19). Dr. Saavedra saw Plaintiff on March 10, 2009. His Progress Notes indicate Plaintiff was a parole violator accused of taking 13 Ultrams at a halfway house, which he denied. Dr. Saavedra noted he was not suicidal or homicidal and was pleasant and

cooperative with organized thought processes. His assessment was depression, by history. He also noted that he suffered insomnia secondary to chronic pain. Dr. Saavedra continued his order for Catapres for help with his anxiety and insomnia and planned to follow up with him in three months (ECF No. 103-2, p. 19).

On March 13, 2009, Dr. Herbick ordered an MRI and on March 27, 2009, he ordered a six month prescription for Methadone pain medication (ECF No. 93-3, p. 44). During April of 2009, Plaintiff was seen several times and additional pain medication was ordered (ECF No. 93-3, p. 45).

On April 13, 2009, Dr. Saavedra made a note to the chart that Plaintiff's case was discussed at the PRT meeting (psychiatric review team). He had chronic pain and was med-seeking. His records indicate that Plaintiff was convicted of robbery of a pharmacy with a gun (ECF No. 103-2, p. 20). On April 29, 2009, Dr. Saavedra saw Plaintiff who complained of an increase in pain and difficulty with ambulation. Dr. Saavedra noted that an MRI had been planned. Dr. Saavedra continued his order for Clonidine and also ordered Benadryl 50 mg at night for sleep and planned to see him again in three months (ECF No. 103-2, p. 20).

On April 30, 2009, Defendant Cowden saw Plaintiff on sick call where he complained he was unable to sleep because of his mattress and further stated that he was missing meals because was is difficult to get around. He requested to reside in the infirmary (ECF No. 93-2, p. 47). At that time, Plaintiff was placed on the MD line to discuss infirmary housing (ECF no. 93-3, p. 45). Records indicate that he missed that appointment, which was scheduled for May 4, 2009 (ECF no. 93-2, p. 47).

On May 20, 2009, Plaintiff requested sick call complaining "I can't take this pain any longer." (ECF No. 93-2, p. 48). At that time, he was placed in the infirmary due to his back pain

and on May 22, 2009, the MRI was performed.  On May 26, 2009, Dr. Herbick reviewed the results of the MRI, which showed degenerative disc disease, moderately severe bilateral neural foraminal stenosis at L4-L5, and disc bulge at L-3-4, L1-2 (ECF No. 93-2, p. 51).  At that time, Dr. Herbick discharged Plaintiff from the infirmary and ordered lower tier, bottom bunk housing status (ECF No. 93-3, p. 46).

On May 29, 2009, Plaintiff was seen on sick call by Defendant Cowden, who ordered him the use of a cane for one year.  On June 8, 2009, Plaintiff signed up for sick call complaining of back pain and difficulty walking to and from dietary (ECF No. 93-2, p. 52).  On June 12, 2009, Plaintiff was seen on sick call by PA Cowden for his back pain and methadone renewal (ECF No. 93-2, p. 53); Dr. Herbick ordered his methadone that same day (ECF No. 93-3, p. 47).

On June 16, 2009, Plaintiff signed up for sick call complaining that his leg gave out while he was walking away from the pill line.  At that time he was placed in the infirmary for observation (ECF No. 93-2, p. 53).  On June 17, 2009, he was placed in medical housing, given a lumbar support and ordered an EMG (ECF No. 93-3, p. 48).  On June 18, 2009, he was given Flexeril and on June 19, 2009, his methadone was renewed.  *Id*.

On June 24, 2009, Progress Notes indicate that Plaintiff was walking around without using his cane or any assistive device (ECF No. 93-2, p. 56).  On June 24, 2009, Plaintiff signed up for sick call requesting a wheelchair and to be released from medical housing.  He further told medical personnel that he needed an operation and that the EMG test would not be able to tell anything.  Progress Notes indicate that his requests would be passed on the Health Administrator. *Id*.  On that same date, Dr. Herbick and Defendant Tretenik denied Plaintiff's request for a wheelchair.  Plaintiff's pain medications were refilled on June 25, 2009.

On July 1, 2009, security staff reported that Plaintiff was seen doing abdominal crunches

in his cell (ECF No. 93-2, p. 58).  On July 6, 2009, Plaintiff signed up for sick call complaining that his leg was getting worse with numbness especially in lower leg.  His Progress Notes show that his conservative care should be continued (ECF No. 93-2, p. 59).  On that same day, his Progress Notes indicate that he was walking around the infirmary without any assistive devices and without his lumbar support.  *Id*.

On July 13, 2009, Plaintiff signed up for sick call and asked PA Cowden about a stool softener and what medical planned to do about his numbness and pain.  He also stated that he wanted out of the infirmary (ECF No. 93-2, p. 61).  On that same date, Dr. Herbick ordered a thirty-day prescription for Colace (ECF No. 93-3, p. 50).

Dr. Saavedra saw Plaintiff on July 6th, 2009 and noted that he had been diagnosed with spinal stenosis.  Plaintiff complained that he had difficulty with ambulation and was upset that he had been denied a wheelchair.  Dr. Saavedra's assessment was adjustment disorder, anxious mood. He discontinued the order for Benadryl because Plaintiff said it was not helpful.  He ordered Doxepin 50 mg at bed time for sleep and continued the prescription for Clonidine (ECF No. 103-2, p. 18).  Dr. Saavedra saw Plaintiff again two days later on July 8, 2009 when he complained of side effects from the Doxepin and said he still had insomnia.  Dr. Saavedra's discontinued the Doxepin and increased the Clonidine to 0.2 mg at night.

On July 14, 2009, Plaintiff was seen doing wall pushups and shoulder exercises in his cell (ECF No. 93-2, p. 61).  The next day, nursing noted that Plaintiff completed 22 modified pushups without stopping, ambulated without difficulty and was observed doing various exercises.  On July 15, 2009, Progress Notes indicate that Plaintiff was loud and inappropriate and making demands to staff and disrupting his cellmate.  At that time, he was placed in an isolation cell (ECF No. 93-2, p. 62).  On July 16, 2009, Plaintiff signed up for sick call

complaining that he almost fell because of his leg pain and requested a renewal for his methadone. He was seen by Defendant Cowden who referred his request to Dr. Herbick who refilled his medication (ECF No. 93-3, p. 50). On July 24, 2009, the EMG previously ordered for Plaintiff was performed on his lower extremities (Ex. 23, Consultation Record). On July 28, 2009, Plaintiff signed up for sick call complaining that he could not walk and needed something for the pain. He was seen by Defendant Cowden who referred his request to Dr. Herbick who ordered a 30-day prescription for Tylenol (ECF No. 93-3, p. 51). His Methadone prescription was renewed by Dr. Herbick on July 31, 2009 and on August 6, 2009.

Dr. Saavedra saw Plaintiff on August 3, 2009 where he complained that he was frustrated with being in the Infirmary. Dr. Saavedra's assessment was chronic pain; he continued his prescription of Clonidine, and planned to follow up in 2 to 3 months. That same day Dr. Saavedra prepared a parole evaluation form noting that Plaintiff was psychiatrically stable and had been receiving treatment for a mood disorder not otherwise specified. Dr. Saavedra noted he was still residing in the Infirmary for evaluation of chronic pain and unstable gait. He had a diagnosis of spinal stenosis and complained of lower extremitiy pain. He was frustrated due to his stay in the Infirmary but was eating and sleeping well. Dr. Saavedra's recommendation was that if he was paroled, he should follow up with an outside program for continued mental health and substance abuse issues (ECF No. 103-2, p. 16).

On August 16, 2009, Plaintiff was observed exercising in his cell, bending at the waist, standing up straight and walking with no signs of distress (ECF NO. 93-2, p. 66). On August 18, 2009, Dr. Herbick reviewed the results of Plaintiff's EMG, found them to be normal and discharged Plaintiff from the infirmary (ECF NO. 93-2, p. 67). On August 21, 2009, Plaintiff signed up for sick call requesting a stool softener and Methadone refill, both of which were

ordered that same day (ECF No. 93-3, p. 53). His Methadone was reordered on August 28, 2009.

Dr. Saavedra saw Plaintiff on September 2, 2009. Plaintiff complained that he had difficulty ambulating and wanted to be transferred to a Special Needs Unit. Dr. Saavedra's assessment was essentially the same, though he noted anxiety disorder not otherwise specified. He continued the Clonidine (ECF No. 103-2, p. 14).

On September 4, 2009, Plaintiff requested renewal of his medications and told medical he would be leaving soon. He continued to receive renewals for his pain medications throughout the rest of 2009.

Plaintiff was seen by Dr. Saavedra on October 7, 2009 where he complained of insomnia due to chronic pain and stress and anxiety and said he was frustrated with the medical department. Dr. Saavedra discontinued the Clonidine and ordered Elavil 50 mg at night for insomnia (ECF No. 103-2, p. 14). Dr. Saavedra saw Plaintiff again on October 21, 2009 when he complained of side effects from Elavil and requested a retrial of Clonidine, saying it helped relax him. Dr. Saavedra discontinued the Elavil and re-ordered Clonidine (ECF No. 103-2, p. 15). Dr. Saavedra saw Plaintiff again on October 30, 2009 and re-ordered Clonodine. On November 6, 2009, Dr. Saavedra noted that nursing reported to him that Plaintiff was missing and/or refusing his morning Clonidine and Dr. Saaverda discontinued the order (ECF No. 103-2, p. 12).

On November 13, 2009, Plaintiff signed up for sick call and again asked for wheelchair. He was seen by Dr. Min Park who reviewed his EMG and MRI results and explained that a wheelchair was not advised because ambulation actually helped his condition and the use of a wheelchair would lead to the inability to walk (ECF No. 93-2, p. 74). Instead, Dr. Park ordered

physical therapy. On November 24, 2009, Dr. Herbik examined Plaintiff for a routine back follow-up. He noted a normal gait and a recent normal EMG with some numbness on the left calf but no atrophy (ECF no. 93-2, p. 75). Plaintiff was released on parole on December 10, 2009.

On December 16, 2009, Plaintiff was seen in the emergency room at Allegheny General Hospital (AGH) for evaluation of back pain (ECF No. 93-20) (AGH Records). A MRI was performed, which showed L-4-L5 herniation with mild stenosis but was negative for emergent conditions. In light of this, AGH determined that Plaintiff could be discharged; he was given the telephone number of neurosurgery for follow-up.

On January 5, 2010, Plaintiff was admitted to UPMC Mercy for increasing pain in his lower back and legs, weakness in his legs and incontinence. A MRI was performed and surgery was recommended. After advising Plaintiff that there was no guarantee of any improvement from surgery, Plaintiff elected to proceed to surgery (ECF No. 93-18, p. 1). On January 6, 2010, Plaintiff underwent back surgery (ECF no. 93-18). On January 10, 2010, he was transferred for rehabilitation to an inpatient rehabilitation unit at UPMC Mercy, where he stayed through January 19, 2010 (ECF no. 93-19).

On August 12, 2010, Plaintiff was readmitted to SCIP as a parole violator. On August 17, 2010, he was referred to the medical line for chronic pain management (ECF No. 93-2, p. 81). Thereafter, Plaintiff was seen approximately once every two weeks or so for pain medication refills (ECF No.93-2). On November 26, 2010, Plaintiff saw Defendant Cowden for sick call and requested a wheelchair and a handicapped cell. She adjusted his medications and referred him to medical for an evaluation (ECF No. 93-2, p. 88). Cowden noted that Plaintiff did not need a wheelchair at that time as he was able to ambulate to the door well. Plaintiff's

medical records indicate that his pain medications were routinely renewed and adjusted in accordance with his needs.

C. Exhaustion of Administrative Remedies

In the Prison Litigation Reform Act (PLRA), Pub. L. No. 104-134, 110 Stat. 1321 (1996), Congress amended the Civil Rights of Institutionalized Persons Act, 42 U.S.C.A. § 1997e, concerning suits by prisoners. Before the amendments, prisoners challenging the conditions of their confinement under 42 U.S.C. § 1983 were not required to exhaust administrative remedies before filing suit. The PLRA amended section 1997e(a), as follows, making exhaustion a mandatory requirement.

(a)     Applicability of administrative remedies

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a), as amended.

The United States Court of Appeals for the Third Circuit analyzed the applicability of the exhaustion requirement in 42 U.S.C. § 1997e in Nyhuis v. Reno, 204 F.3d 65 (3d Cir. 2000) (Bivens action brought by a federal inmate) and Booth v. Churner, 206 F.3d 289 (3d Cir. 2000) (civil rights action brought by a state prisoner). In each of these cases, the Court of Appeals announced a bright line rule that inmate-plaintiffs must exhaust all available administrative remedies before they can file an action in federal court concerning prison conditions. In so holding, the court specifically rejected the notion that there is ever a futility exception to section 1997e(a)'s mandatory exhaustion requirement. Booth, 206 F.3d at 300; Nyhuis, 204 F.3d at 66. A unanimous Supreme Court affirmed the Court of Appeals' holding in Booth where the Court confirmed that in the PLRA Congress mandated complete exhaustion of administrative remedies,

regardless of the relief offered through those administrative procedures. *See* Booth v. Churner, 532 U.S. 731 (2001) (holding that the PLRA requires administrative exhaustion even where the grievance process does not permit award of money damages and prisoner seeks only money damages, as long as grievance tribunal has authority to take some responsive action). In addition, in Porter v. Nussle, 534 U.S. 516 (2002), the Supreme Court clarified that the PLRA's exhaustion requirement applies to all inmate suits concerning prison life, whether they involve general circumstances or specific episodes and whether they allege excessive force or other conduct.

The administrative grievance procedure for Pennsylvania inmates is codified in the Pennsylvania Department of Corrections Policy Statement No. DC-ADM 804-1, entitled "Consolidated Inmate Grievance Review System." The purpose of the grievance system is to insure that every inmate confined in a Bureau of Correction facility has an avenue through which prompt resolution of any problem which arises during the course of confinement may be sought. The grievance system applies to all state correctional institutions and provides three levels of review: 1) initial review by the facility grievance coordinator; 2) appeal of initial review to the superintendent or regional director; and 3) final appeal to the Secretary's Office. The administrative policy further provides that, prior to utilizing the grievance system, prisoners are required to attempt to resolve problems on an informal basis through direct contact or by sending an inmate request slip to the appropriate staff member.

The Court of Appeals for the Third Circuit repeatedly has instructed that a prisoner's failure to comply with the procedural and substantive requirements of DOC's grievance policy results in procedural default, thereby precluding an action in federal court. *See* Torrence v. Thompson, 435 Fed. App'x 56, 593 (3d Cir. 20011) (state inmate's assertion that he needed his

limited funds to pursue his civil rights lawsuits against state corrections department did not warrant excusing his failure to exhaust administrative remedies through prison grievance process, due to his refusal to submit copies of items required to perfect appeal); Banks v. Roberts, 251 Fed. App'x 774 (3d Cir. 2007) (holding that federal prisoner, who did not wait to file his Bivens complaint in federal court until after he had received final determinations from his administrative filings and completed the appeal process as to those determinations, failed to comply with PLRA mandatory exhaustion requirement); Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004).

The United States Supreme Court adopted a similar holding in Woodford v. Ngo, 548 U.S. 81 (2006) wherein it held that an untimely or otherwise procedurally defective administrative grievance or appeal does not satisfy the PLRA's mandatory exhaustion requirement.

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." This Court has described the doctrine as follows: "[A]s a general rule courts should not topple over administrative decisions unless the administrative body not only has erred, but has erred against objection made at the time appropriate under its practice." Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings.

Woodford, 548 U.S. at 90-91 (internal citations, quotations and footnotes omitted).

The Court further noted that "[c]onstruing § 1997e(a) to require proper exhaustion also fits with the general scheme of the PLRA, whereas respondent's interpretation would turn that provision into a largely useless appendage. "A prisoner who does not want to participate in the

prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction" and "[t]he benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance." *Id*. at 93-94. The PLRA attempts to eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case. *Id*. The Court concluded that the benefits of exhaustion could only be realized if the prison grievance system is given a fair opportunity to consider the claims, which required the grievant to comply with the procedural rules. *Id*.

In the case at bar, DOC records show that, with respect to the issues raised in the current action during the relevant time period, Plaintiff filed the following grievances to all three levels of DOC administrative review.

On May 12, 2009, Plaintiff filed Grievance Number 272743 wherein he complained that he was missing meals and requested to be housed in a handicapped cell or the infirmary or issued a wheelchair with an inmate pusher. He further complained that his MRI had not been conducted to date. The Grievance was referred to Health Care Administrator Robert Tretinik, who made the following response.

The following is a summary of my findings regarding your grievance:

COMPLAINT: The grievant states that he is not receiving proper medical care.

FINDING OF FACT:

1.  The inmate was seen on May 12, 2009 to complete the MRI questionnaire.

2.  He was scheduled to be transferred to SCI-Smithfield for the MRI on May 19, 2009. The transfer was cancelled by SCI-Smithfield because of problems with the equipment.

3.      The inmate is incorrect about the 60 day rule.  The BHCS has given the vender an extension to the 60 days since all MRI's are completed at SCI-Smithfield.

4.      The inmate is receiving medications for his alleged back pain and has been observed ambulating on the walkways with difficulty.

5.      His request for a handicap cell, wheelchair, and compensation along with this frivolous grievance is denied.

Conclusion:    No merit.

ECF No. 93-4, p. 5.

Plaintiff appealed to Superintendent Coleman who replied as follows.

I am in receipt of your appeal of grievance #272743.  In preparing this response I have reviewed your original grievance, the Grievance Officer's response, and your appeal to this office.

#4 on Mr. Tretinik's response contained a typographical error.  It should read ".... ambulating on the walkways without difficulty."  I reviewed your medical information with staff in that department.  The MRI at SCI Smithfield was cancelled by that institution.  You have since received an MRI and the results are the same as the last test you had - there has been no change. You were placed in the infirmary from 5/20 - 5/26 for observation.  During this time you were observed ambulating without difficulty and using the commode without any problems.  You have been prescribed medication and your cane was issued to you on May 29.  It is obvious that your medical needs are being addressed.

Based on the above information I find the response from the investigating officer appropriate and your appeal lacking any credible evidence upon which I would consider remanding the issue for further review.  I am upholding the Initial Review Response and denying your appeal.

ECF No. 93-4, p. 3.  Plaintiff appealed and the grievance was referred to the Bureau of Health Care Services, which found the medical care provided at SCI Fayette to be reasonable and appropriate (ECF No. 93-4, p. 1).

On August 25, 2009, Plaintiff filed Grievance Number 286399 wherein he complained about being held in an infirmary isolation cell for 46 days (from 6-16-2009 to 6-26-2009 and from 7-15-2009 to 8-18-2009) where he was not allowed outside yard recreation, a razor, cable

television and phone call privileges.  He further claims that his cell was illuminated twenty-four hours a day (ECF No. 93-7, p. 9).  The Grievance was referred to Defendant Tretinik, who filed the following response on August 31, 2009.

The following is a summary of my findings regarding your grievance:

COMPLAINT:          The grievant states that he was placed in the infirmary and was not permitted to leave.

FINDING OF FACT:

1.      The inmate was placed in the infirmary because he alleged that he could not walk.

2.      On July 15, 2009 he was moved into a self-contained isolation cell because he was disrupting the infirmary operations with inappropriate actions.

3.      The lights remain on in the infirmary for security reasons and so that medical staff can observe the inmates.

4.      The inmate was given several opportunities to leave the infirmary but he demanded a wheelchair.

5.      A MRI was completed on the inmate on May 22, 2009 and the results were negative.

6.      On July 24, 2009 nerve conduction studies were completed and the results were negative.  The inmate's subjective complaints could not be verified by objective clinical testing.

7.      On August 28, 2009 all test results were discussed with the inmate and the inmate decided to return to general population.

8.      The inmate received proper medical care based on his subjective complaints. His request for monetary compensation along with the frivolous grievance is denied.

ECF No. 93-7, p. 8.

Plaintiff appealed this denial and requested that he be referred to a specialist with his

recent MRI results (ECF No. 93-7, pp. 6-7).[2]  On September 14, 2009, Superintendent Coleman

filed the following response.

> I am in receipt of your appeal of grievance #286399.  In preparing this response I have
> reviewed your original grievance, the Grievance Officer's response, and your appeal to
> this office.
>
> You were housed in the infirmary in order to complete a series of test.  You were asked
> several times if you wanted to leave and your response was always no- you couldn't walk.
> Your last MRI showed no changes from the one done in 2004.  Several other tests were
> completed and they were all negative.  The doctor and Mr. Tretinik sat down with you
> and reviewed all your test results and you got up and walked out of the infirmary and Mr.
> Tretinik has not heard from you since.  You were housed in the infirmary due to
> complaints of not being able to walk.  If you could not walk in the infirmary, how would
> you take part in yard activities?  You do not pay for cable and there are no inmate phones
> in the medical department so you would receive only an emergency phone call.  There are
> no clinical findings to support your contention that you need a wheelchair.  The lights
> remain on in medical for security reasons and to allow for observation of inmates who are
> housed in the infirmary.
>
> Based on the above information I find the response from the investigating officer
> appropriate and your appeal lacking any credible evidence upon which I would consider
> remanding the issue for further review.  I am upholding the Initial Review Response and
> denying your appeal.

ECF No. 93-7, p. 5.  Plaintiff appealed and the grievance was referred to the Bureau of Health

Care Services, which upheld the denial (ECF No. 93-7, p. 2).

Subsequently, Plaintiff filed several unsuccessful grievances requesting the use of a

wheelchair.  *See* ECF No. 93-4 through 93-11.  Thus, the claims for which Plaintiff has

completely exhausted his administrative remedies are those related to:  1) being housed in the

infirmary for 46 days; 2) his medical care for his back pain; and 3) his request for a handicapped

cell or a wheelchair.

### D. Liability under 42 U.S.C. § 1983

---

[2]  Although this appeal is dated August 4, 2009, it is assumed that this is an error by Plaintiff and
that he meant to date it September 4, 2009.

The Plaintiff's Complaint seeks to assert liability against Defendants pursuant to 42 U.S.C. § 1983. To state a claim under 42 U.S.C. § 1983, a plaintiff must meet two threshold requirements. He must allege: 1) that the alleged misconduct was committed by a person acting under color of state law; and 2) that as a result, he was deprived of rights, privileges, or immunities secured by the Constitution or laws of the United States. West v. Atkins, 487 U.S. 42 (1988); Parratt v. Taylor, 451 U.S. 527, 535 (1981), *overruled in part on other grounds*, Daniels v. Williams, 474 U.S. 327, 330-331 (1986).

To establish personal liability against a defendant in a section 1983 action, that defendant must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior. Rizzo v. Goode, 423 U.S. 362 (1976). Accordingly, individual liability can be imposed under section 1983 only if the state actor played an "affirmative part" in the alleged misconduct. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988); Chinchello v. Fenton, 805 F.2d 126, 133 (3d Cir. 1986). Personal involvement by a defendant can be shown by alleging either personal direction or actual knowledge and acquiescence in a subordinate's actions. Rode, 845 F.2d at 1207. *See also* Keenan v. Philadelphia, 983 F.2d 459, 466 (3d Cir. 1992); Andrews v. Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990).

Moreover, a supervising public official has no affirmative constitutional duty to supervise and discipline so as to prevent violations of constitutional rights by his or her subordinates. Notwithstanding, when a supervising official knowingly permits a continuing custom or policy that results in harm to the plaintiff, 1983 liability may attach. Colburn v. Upper Darby Township, 838 F.2d 663, 673 (3d Cir. 1988), *cert. denied*, 489 U.S. 1065 (1989) (Colburn I). However, at a minimum such liability may be imposed "only where there are both (1)

contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval to the offending subordinate." *Id*. (quoting Chinchello, 805 F.2d at 133). *See also* Bonenberger v. Plymouth Township, 132 F.3d 20, 25 (3d Cir. 1997).

E. The Eighth Amendment

Plaintiff's allegations invoke liability under the Eighth Amendment, which provides as follows.

> Excessive bail shall not be required, nor excessive fines imposed, nor cruel and
> unusual punishments inflicted.

U.S. Const. amend. VIII.

The Eighth Amendment protects individuals against the infliction of "cruel and unusual punishments." This protection, enforced against the states through the Fourteenth Amendment, guarantees incarcerated persons humane conditions of confinement. In this regard, prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and must "take reasonable measures to guarantee the safety of the inmates." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)).

Notwithstanding, not every injury raises constitutional concerns. A prison official violates the Eighth Amendment only when two requirements are met. The inmate must show that: 1) he suffered a risk of "serious" harm; and 2) prison officials showed "deliberate indifference" to such risk. Farmer, 511 U.S. at 834. The first element is satisfied when the alleged "punishment" is "objectively sufficiently serious." *Id*. In determining whether a prisoner has alleged a risk that is objectively serious, a court must consider not only the seriousness of the potential harm and the likelihood that the harm will actually occur, but evidence that unwilling exposure to that risk violates contemporary standards of decency. In other words, the

prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate. <u>Helling v. McKinney</u>, 509 U.S. 25, 35 (1993).

The second criterion, deliberate indifference, requires an inmate to show that the prison official had a sufficiently culpable state of mind. The Supreme Court clarified this deliberate indifference standard in <u>Farmer</u> as follows.

> We reject petitioner's invitation to adopt an objective test for deliberate indifference. We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement <u>unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.</u> This approach comports best with the text of the Amendment as our cases have interpreted it. The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. . . . But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

<u>Farmer</u>, 511 U.S. at 837-838 (emphasis added).

1.   <u>Conditions of Confinement</u>

Plaintiff alleges that the conditions of his confinement in the infirmary for 46 days violated the Eighth Amendment prohibition against cruel and unusual punishment. Specifically, he complains about the denial of outdoor exercise, razor, television, and access to a telephone, and the constant illumination.

Prison conditions may amount to cruel and unusual punishment if they deprive inmates of the minimal civilized measure of life's necessities. <u>Rhodes v. Chapman</u>, 452 U.S. 337, 349 (1981). In this regard, lack of exercise can rise to a constitutional violation in extreme and prolonged situations where movement is denied to the point that the inmate's health is threatened.

*See* Antonelli v. Sheahan, 81 F.3d 1422, 1432 (7th Cir. 1996); French v. Owens, 777 F.2d 1250, 1255 (holding that lack of exercise may rise to a constitutional violation where movement is denied, muscles are allowed to atrophy and the health of the individual is threatened). In addition, the denial of hygiene supplies that leaves a prisoner exposed to the elements, or unable to care for his most fundamental needs, and thereby puts his health in jeopardy, may implicate the Eighth Amendment. *See* Harris v. Fleming, 839 F.2d 1232, 1235-46, (7th Cir. 1988). Also, requiring inmates to live in constant illumination, under certain circumstances, may rise to the level of an Eighth Amendment violation. *See* Bacon v. Minner, Civil No. 06-3594, 2007 WL 1157138 (3d Cir. April 19, 2007) (citing Keenan v. Hall, 83 F.3d 1083, 1090-91 (9th Cir. 1996) (holding that an allegation that large florescent lights directly in front of and behind an inmate's cell shone into his cell 24 hours a day, so that his cell was constantly illuminated, and he had no way of telling night or day, and that this condition caused him grave sleeping problems and other mental and psychological problems was sufficient to state a claim of cruel and unusual punishment).

Notwithstanding, although prison authorities cannot indefinitely prevent an inmate from receiving exercise outside of their cell, the Eighth Amendment is not violated where the denial of exercise is of a limited duration.[3] The same holds true for hygiene products.[4] Moreover,

---

[3] *See, e.g.*, Knight v. Armontrout, 878 F.2d 1093, 1096 (8th Cir. 1989) ("Denial of recreation for a short period, *per se*, is not a constitutional violation."); Thomas v. Ramos, 130 F.3d 754, 764 (7th Cir. 1997) (70-day denial permissible); Harris v. Fleming, 839 F.2d 1232, 1236 (7th Cir. 1988) (four weeks permissible); Gary v. Rose, 902 F.2d 37 (7th Cir. 1990) (where detainees had room in their cells and in the hallway to run in place or perform calisthenics, their allegations could not amount to a constitutional claim); Illes v. Deparlos, Civil No. 09-1166, 2012 WL 86938 (M.D. Pa. Jan. 11, 2012) (insufficient evidence to support an inference of deliberate indifference to a substantial risk of serious harm where the prisoner was denied out-of-cell exercise for 28 consecutive days).

[4] *See, e.g.*, Matthews v. Murphy, Civil No. 90-35458, 1992 WL 33902, at *4 (9th Cir. Feb. 25,

continuous exposure to low wattage night time security lighting is permissible based on legitimate penological interests such as prison security concerns.[5]  Finally, Plaintiff must allege a substantial injury-in-fact to make a claim for damages; his constitutional rights have no inherent monetary value.  Memphis Cmty. Sch. Dist. v.. Stachura, 477 U.S. 299 (1986).

In the case at bar, the conditions of Plaintiff's 46-day confinement do not rise to an Eighth Amendment violation under the facts of this case.  First of all, Plaintiff actually spent only 35 days in an isolation cell from 7-15-2009 to 8-18-2009.  Second, Plaintiff himself asked to be housed in the infirmary because he was having trouble walking.  As the Superintendent pointed out, it was not reasonable for Defendants to offer Plaintiff outside yard exercise when he was having trouble walking.  Third, the denial of television[6] and phone privileges[7] is not

---

1992) (failure to provide soap, towels, toothpaste, and other hygiene items for 34 days not a violation): Schaeffer v. Schamp, Civil No. 06-1516, 2008 WL 2553474, at *6 (W.D. Pa. June 25, 2008) (failure to provide mattress, soap, and toilet paper for ten days not a violation).

[5]  See, e.g, Chavarria v. Stacks, 102 Fed. Appx. 433, 436-37 (5th Cir. 2004) (policy of constant illumination was reasonably related to the legitimate penological interest of guard security); O'Donnell v. Thomas, 826 F.2d 788, 790 (8th Cir. 1987) (continuous lighting in holding cell not unreasonable given security concern); King v. Frank, 371 F.Supp.2d 977, 984- 85 (W.D. Wisc. 2005) (holding that constant exposure to a 9 watt fluorescent light which allows prison officials to observe inmates at night did not violate Eighth Amendment standards); Willis v. Terhune, 404 F.Supp.2d 1226, 1230-31 (E.D. Cal. 2005) (exposure to 24 hour 13 watt security bulb did not constitute cruel and unusual punishment in absence of evidence of grave sleeping problems or other harm).

[6]  See Murphy v. Walker, 51 F.3d 714, 718 (7th Cir. 1995) (finding no support in the case law for claim that denial of cigarettes and television amounts to a constitutional violation); Scheanette v. Dretke, 199 Fed. App'x 336 (5th Cir. 2006) (denial of televisions to death row inmates not cruel and unusual because watching television is not a life necessity or a basic human need); Elliott v. Brooks, 188 F.3d 518, 199 WL 525909 (10th Cir. 1999) (no constitutional right to watch television in prison).

[7]  See Azzara v. Scism, Civil No. 11-1075, 2012 WL 722342, 7 (M.D. Pa. March 1, 2012) ("loss of privileges, in general, does not amount to infliction of cruel and unusual punishment, and loss of visitation and telephone privileges is no exception to this rule.") (citing cases); Allebach v. Sherrer, Civ. No. 04–287, 2005 WL 1793726 (D.N.J. July 27, 2005) (holding that denial of

punishment.  Fourth, he was housed in the infirmary for an extended period so that medical tests could be performed and was released directly afterward.  Fifth, and most important, Plaintiff does not allege that he suffered any physical or emotional injury as a result of the conditions of his confinement in the infirmary for 46 days.  Rather, his complaints of insomnia and physical discomfort are, according to him, the result of his back condition.  Thus, Defendants are entitled to summary judgment as to this claim.

2.    <u>Failure to Provide Medical Treatment</u>

Plaintiff also asserts an Eighth Amendment claim alleging failure to provide adequate medical treatment.  To state an Eighth Amendment violation in the context of medical treatment, an inmate must show prove two elements:  1) plaintiff was suffering from a "serious medical need," and 2) prison officials were deliberately indifferent to the serious medical need.  <u>Gamble v. Estelle</u>, 427 U.S. 107 (1978).  The first showing requires the court <u>objectively</u> to determine whether the medical need was "sufficiently serious."  A medical need is "serious" if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.  <u>Gaudreault v. Municipality of Salem</u>, 923 F.2d 203, 208 (1st Cir. 1990); <u>Monmouth County Correctional Institutional Inmates v. Lanzaro</u>, 834 F.2d 326, 347 (3d Cir. 1987).  The second prong requires a court <u>subjectively</u> to determine whether the officials acted with a sufficiently culpable state of mind.  Deliberate indifference may be manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, a denial of prescribed medical treatment, or a denial of reasonable requests for treatment that results in suffering or risk of injury.  <u>Durmer v. O'Carroll</u>, 991 F.2d 64, 68 (3d Cir. 1993).

---

running water, religious items, visitation, recreation, use of the telephone, mattress and clothing

As an initial matter, the record facts are insufficient to support liability against Defendant Coleman as the Superintendent of SCI-Fayette.  Specifically, although Plaintiff alleges that Defendant Coleman was aware of his medical concerns, the record evidence does not support a finding that Defendant Coleman had any personal involvement in the claims alleged in the Complaint.  Moreover, Defendant Coleman does not have any authority to make treatment decisions concerning Plaintiff's medical care.  *See* Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993) (warden and commissioner cannot be considered deliberately indifferent by failing to directly respond to a medical complaint by a prisoner who was receiving treatment by the prison doctors).  *See also* Ayala v. Terhune, 195 Fed. App'x 87, 91 (3d Cir. 2006) (upholding grant of summary judgment in favor of prison administrators who refused to approve prisoner-plaintiff's colostomy reversal surgery despite outside doctor's recommendation).

In Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004), the Third Circuit reiterated its holding in Durmer.

> .  .  .  If a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands.  This follows naturally from the division of labor within a prison.  Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on.  Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor.  Moreover, under such a regime, non-medical officials could even have a perverse incentive not to delegate treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability.
>
> Accordingly, we conclude that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.  Thus dismissal of [a prisoner's] claims after the point at which [he] was first under medical care is appropriate because [the prisoner] bears the burden of proving (and hence pleading) facts supporting the defendants' mental states, *see* Singletary v. Pa.

---

for thirty-six (36) days was not cruel and unusual punishment under the Eighth Amendment).

<u>Dep't of Corr.</u>, 266 F.3d 186, 192 n. 2 (3d Cir. 2001), and he has failed to so plead
. . . .

<u>Spruill</u>, 372 F.3d at 236.

Here, the record is clear that Plaintiff has received an extraordinary amount of medical treatment by numerous medical professionals during his confinement. Thus, although Plaintiff alleges some facts that indicate that Defendant Coleman was aware of his medical concerns, they do not show that he was aware, or should have been aware, of any alleged risk to Plaintiff's health based on his medical care. Thus, Defendant Coleman is entitled to summary judgment as to this claim.

Similarly, Plaintiff has failed to show that Dr. Saavedra can be held liable for "failure to intervene" with respect to the claims made in the instant action.

> A doctor associated with a prison cannot be held responsible for failing to intercede in the treatment of a prisoner simply because the prisoner button-holes him and insists that he do so. The chaos that would ensue if doctors were to rush about treating prisoners who are not their patients in order to avoid such liability counsels otherwise. Malik's refusal to intervene in the medical treatment of another doctor's patient simply because the patient demanded it was objectively reasonable as a matter of law.

<u>Cuoco v. Moritsugu</u>, 222 F.3d 99, 111 (2d Cir. 2000).

More importantly, Plaintiff has failed to demonstrate that any Defendant was deliberately indifferent to his medical needs. The "deliberate indifference" standard for purposes of liability under section 1983 is a stringent standard of fault requiring proof that a defendant disregarded a known or obvious consequence of his action. <u>Board of County Commissioners of Bryan County v. Brown</u>, 520 U.S. 397, 410 (1997). The defendant must be both aware of facts from which the inference could be drawn that a substantial harm exists and he must also draw the inference. <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994). An official is not deliberately indifferent if "he fails to alleviate a significant risk that he should have identified." *Id*. Moreover, deliberate

indifference to a serious medical need of a prisoner is distinguishable from a negligent diagnosis or treatment of a medical condition; only the former conduct violates the Eighth Amendment. Medical malpractice may give rise to a tort claim in state court but does not necessarily rise to the level of a federal constitutional violation. Kost v. Kozakiewicz, 1 F.3d 176, 185 (3d Cir. 1993); Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1993).

The Supreme Court explained the difference between negligence and constitutional claims in Estelle v. Gamble, 429 U.S. 97, 104 (1978). In that case, the prisoner, Gamble, was injured when a bale of cotton fell on him while he was unloading a truck. He went to the unit hospital where a medical assistant checked him for a hernia and sent him back to his cell. He returned to the hospital where he was given pain pills by an inmate nurse and then was examined by a doctor. The following day, his injury was diagnosed as a lower back strain; he was prescribed a pain reliever and a muscle relaxant. Over the course of several weeks, Gamble was seen by several doctors who prescribed various pain relievers and provided him with medical work excuses. Ultimately, despite his protests that his back hurt as much as it had the first day, medical staff certified Gamble to be capable of light work. During the next two months, Gamble received a urinalysis, blood test, blood pressure measurement, and pain and blood pressure medication. Subsequently, a medical assistant examined Gamble and ordered him hospitalized for treatment of irregular cardiac rhythm.

The Supreme Court held that Gamble's allegations failed to state a claim upon which relief could be granted against the defendant, both in his capacity as a treating physician and as the medical director of the Corrections Department.

> Gamble was seen by medical personnel on 17 occasions spanning a 3-month period . . .. They treated his back injury, high blood pressure, and heart problems. Gamble has disclaimed any objection to the treatment provided for his high blood pressure and his heart problem; his complaint is "based solely on the

lack of diagnosis and inadequate treatment of his back injury." The doctors diagnosed his injury as a lower back strain and treated it with bed rest, muscle relaxants and pain relievers. Respondent contends that more should have been done by way of diagnosis and treatment, and suggests a number of options that were not pursued. The Court of Appeals agreed, stating: "Certainly an x-ray of (Gamble's) lower back might have been in order and other tests conducted that would have led to appropriate diagnosis and treatment for the daily pain and suffering he was experiencing." But the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court under the Texas Tort Claims Act.

Gamble, 427 U.S. at 107 (internal citations omitted) (emphasis added).

The record evidence reveals that the Defendants acted responsibly in attending to Plaintiff's medical needs. While an intentional refusal to provide any medical treatment to an inmate suffering from a serious medical need manifests deliberate indifference and is actionable under the Eighth Amendment, the Eighth Amendment does not require that a prisoner receive every medical treatment that he requests or that is available elsewhere. A disagreement as to the appropriate choice of medical treatment does not give rise to a constitutional violation because the "right to be free from cruel and unusual punishment does not include the right to the treatment of one's choice." Layne v. Vinzant, 657 F.2d 468, 473 (1st Cir. 1981). Mere disagreements over medical judgment do not state Eighth Amendment claims as there are typically several acceptable ways to treat an illness. Young v. Quinlan, 960 F.2d 351, 358 n.18 (3d Cir. 1992); White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990).

Plaintiff tries to suggest that Defendants were deliberately indifferent by failing to approve him for surgery instead of using a more conservative approach in treating his back condition. However, even Plaintiff admitted that the surgery was not the success that he had hoped it would be. Moreover, the hospital records indicate that Plaintiff was warned that surgery

might not result in any significant change. Plaintiff elected to proceed to surgery but it was not an emergency situation. Nor is there any evidence that the conservative care he received pre-surgery had any impact on his post-operative condition.

Moreover, there is no record evidence to support liability with respect to the denial of a wheelchair. Plaintiff was issued a cane and a back brace. There simply is nothing in the record that suggests that Defendants knew that Plaintiff faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it. Thus, Defendants are entitled to summary judgment with respect to this claim as well.

## F. Fourteenth Amendment

Plaintiff also appears to be asserting claims under the Due Process Clause of the Fourteenth Amendment, which provides as follows.

> Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, §1 (emphasis added).

Three kinds of section 1983 claims may be brought against the State under the Due Process Clause of the Fourteenth Amendment. Zinermon v. Burch, 494 U.S. 113, 125 (1990). First, a plaintiff may bring suit under section 1983 for a violation of his specific rights as guaranteed by the Bill of Rights. Id. Second, a plaintiff may assert a Fourteenth Amendment claim under the "procedural" aspect of the Due Process Clause, which guarantees fair procedure for the deprivation of a constitutionally-protected interest in life, liberty or property. Id. Third, a plaintiff may assert a claim under the "substantive" prong of the Due Process Clause, which bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used

to implement them.  *Id*. (quoting Daniels v. Williams, 474 U.S. at 331)).  The discussion above reveals that plaintiff has failed to state a claim upon which relief may be granted with respect to his specific rights as guaranteed in the Bill of Rights by the Eighth Amendment.  Thus, the Court will consider whether he may assert liability under either the procedural or substantive prong of the Due Process Clause.

1.    Procedural Due Process

The protections of the procedural aspect of the Due Process Clause are triggered only if there is a deprivation of a protected interest in life, liberty, or property.  Thus, the threshold question presented is whether Defendants' actions impacted a constitutionally-protected liberty interest.  In Sandin v. Conner, 515 U.S. 472 (1995), the Supreme Court pronounced a new standard for determining whether prison conditions deprive a prisoner of a liberty interest that is protected by due process guarantees.  Specifically, the Supreme Court held that prison conditions do not impact a protectable liberty interest unless they result in an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  Sandin, 515 U.S. at 483 (emphasis added).  Applying this test, the Supreme Court concluded that the prisoner in Sandin did not have a protected liberty interest in remaining free of disciplinary detention or segregation because his thirty-day disciplinary detention, though punitive, did not present a dramatic departure from the basic conditions of his sentence.  In making this determination, the Supreme Court looked at two basic factors:  1) the amount of time the prisoner was placed into disciplinary segregation; and 2) whether the conditions of his confinement in disciplinary segregation were significantly more restrictive.  After reviewing these two factors, the Court concluded that thirty days in disciplinary detention, which was similar in many respects to

administrative custody, did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest.

If the inmate had no protected liberty interest in remaining free of restrictive custody, then the inmate was owed no process, in the form of hearings or otherwise, before or during his placement. In deciding whether a protected liberty interest exists under <u>Sandin</u>, a federal court must consider the duration of the disciplinary confinement and the conditions of that confinement in relation to other prison conditions. <u>Mitchell v. Horn</u>, 318 F.3d 523, 532 (3d Cir. 2003) (citing <u>Shoats v. Horn</u>, 213 F.3d 140, 144 (3d Cir. 2000)). What is an "atypical and significant hardship" is determined by "what a sentenced inmate may reasonably expect to encounter as a result of his or her conviction in accordance with due process of law." <u>Sandin</u>, 515 U.S. at 486.

Here, Plaintiff complains of being in an isolation cell for 35 days. Every court, including the Court of Appeals for the Third Circuit, has concluded that confinement in restricted housing for a period of one year or less does not amount to an atypical or significant hardship under the <u>Sandin</u> analysis. *See, e.g.*, <u>Scerbo v. Lowe</u>, 326 Fed. App'x 652, 656 (3d Cir. 2009) (eighteen-month period of confinement in maximum security custody did not implicate a protected liberty interest); <u>Griffin v. Vaughn</u>, 112 F.3d 703, 706 (3d Cir.1997) (exposure to conditions of administrative custody for periods as long as 15 months falls within the expected parameters of sentence imposed). Moreover, the Court of Appeals for the Third Circuit has held that an inmate sentenced to an aggregate of 930 days in disciplinary confinement did not allege an atypical and significant hardship sufficient to trigger a liberty interest under <u>Sandin</u>. *See* <u>Young v. Beard</u>, 227 Fed. App'x 138 (3d Cir. 2007). Thus, Plaintiff's allegations concerning his confinement in the isolation cell does not allege a violation of his procedural due process rights.

2.     Substantive Due Process

The constitutional right to "substantive due process" under the Fourteenth Amendment protects individuals against arbitrary governmental action regardless of the fairness of the procedures used to implement them. The Supreme Court has declined to set forth a precise rule outlining the contours of "arbitrary" conduct. Notwithstanding, in County of Sacramento v. Lewis, 523 U.S. 833 (1998), the Court instructed that the substantive component of the Due Process Clause can be violated by governmental employees only when their conduct amounts to an abuse of official power that "shocks the conscience." In so holding, the court reiterated its long standing jurisprudence that only the most egregious official conduct can be said to be "arbitrary" in the constitutional sense. *Id*. at 1718. The court further instructed that courts should employ a variable range of culpability standards, dependent upon on the circumstances of the case, in determining whether certain actions rise to a constitutionally "shocking" level. *Id*.

In addition, in Lewis, the Court reiterated the following.

> Because we have "always been reluctant to expand the concept of substantive due process," Collins v. Harker Heights, supra, at 125, we held in Graham v. Connor, 490 U.S. 386 (1989), that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." Albright v. Oliver, 510 U.S. 266, 273 (1994) (plurality opinion of Rehnquist, C.J.) (quoting Graham v. Connor, *supra*, at 395) (internal quotation marks omitted).

Lewis, 523 U.S. at 842.

In Lewis, the Court was confronted with the actions of a policeman who killed a motorcyclist during the course of a high speed chase. Because the claims did not arise under the Fourth Amendment, the Court proceeded to analyze them under substantive due process.

In the case at bar, however, Plaintiff's claims clearly are covered under the Eighth Amendment; thus, substantive due process analysis is inappropriate. To the extent that Plaintiff

is raising claims that are not covered under the Eighth Amendment, there is nothing in the record to show that any of the Defendant's actions rise to a constitutionally shocking level. Thus, Plaintiff has failed to demonstrate that he was exposed to arbitrary government action in violation of his right to substantive due process.[8] *See, e.g.*, <u>Davidson v. Cannon</u>, 474 U.S. 344, 348 (1986) (clarifying that lack of due care does not state a claim under either the substantive or the procedural aspects of the Due Process Clause).

## III.    <u>CONCLUSION</u>

For the reasons set forth above, it is respectfully recommended that Plaintiff's Motion for Summary Judgment (ECF No. 84) be denied and that the Motions for Summary Judgment filed by Defendants (ECF. Nos. 86, 90 and 102) all be granted.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) & (C), and the Local Rules, the parties are allowed fourteen (14) days from the date of service to file written objections to this report. Any party opposing the objections shall have 14 days from the date of service of the objections to respond thereto. Failure to timely file objections will constitute a waiver of any appellate rights.

<div style="margin-left: 50%;">

/s Cynthia Reed Eddy
Cynthia Reed Eddy
United States Magistrate Judge
</div>

January 17, 2013

---

[8] Here, because Plaintiff has failed to establish the violation of any of his federal rights, he cannot, *a fortiori*, establish a civil conspiracy under Section 1983 because such requires the commission of an underlying federal civil rights violation, which Plaintiff has failed to establish. <u>In re Orthopedic Bone Screw Products Liability Litigation</u>, 193 F.3d 781, 789 (3d Cir. 1999) ("[O]ne cannot sue a group of defendants for conspiring to engage in conduct that would not be actionable against an individual defendant.").